**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| **v.** | ) | **I.D. No. 1207010738** |
| | ) | |
| **JASON SLAUGHTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Date Submitted: January 4, 2017
Date Decided: January 10, 2017

*Upon the State's Motion in Limine to Admit Evidence of Other Crimes,*
*Wrongs, or Acts under Delaware Rule of Evidence 404(b)*
***GRANTED in Part and DENIED in Part***

Colleen K. Norris, Esquire, Cari Chapman, Esquire, Phillip Casale, Esquire, Delaware Department of Justice, Wilmington, Delaware, *Attorneys for the State*.

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware, and Natalie S. Woloshin, Esquire, Woloshin, Lynch & Natalie, Wilmington, Delaware, *Attorneys for Jason Slaughter*.

**DAVIS, J.**

## I. INTRODUCTION

Before the Court is the State's Motion *in Limine* to Admit Evidence (the "Motion") filed by the State of Delaware. Through the Motion, the State seeks to introduce ten separate crimes, wrongs, or other acts under Delaware Uniform Rules of Evidence 404(b) as proof of Defendant Jason Slaughter's motive, plan, and identity in relation to the murder of Christopher Masters. Mr. Slaughter opposes all of the relief sought in the Motion. Consistent with the guidelines set forth in *Getz v. State*[1] and *Deshields v. State*[2], the Motion is **GRANTED in Part** and **DENIED in Part.**

---

[1] 538 A.2d 726 (1988).
[2] 706 A.2d 502 (1998).

## II. BACKGROUND

### A. FACTS RELEVANT TO THE MOTION[3]

On December 14, 2007 at approximately 2:45 a.m., Delaware police responded to the scene of a homicide at 33 Summit Bridge Trailer Park in Newark, Delaware. At the scene, police discovered the body of Christopher Masters. Mr. Masters died from a gunshot wound to the head. Police then learned that another subject had also been shot in connection to the same crime and was at Christiana Hospital for treatment. Police arrived at Christiana Hospital, interviewed the subject that had been shot, and identified him as Jason Slaughter. Mr. Slaughter explained that he and Mr. Masters were hanging out in or about Mr. Master's trailer when two men approached them. According to Mr. Slaughter, the two men attempted to rob them and one of them shot Mr. Masters. Mr. Slaughter also explained that this same man had shot him in the shoulder. Police continued to investigate the death of Mr. Masters, but the case became an inactive investigation until June of 2010 when the Georgia Bureau of Investigations ("GBI") contacted Delaware police.

On May 7, 2010, more than two years after the murder of Mr. Masters, police in Georgia found the body of a "John Doe" on the side of the road in Macon County, Georgia. GBI began investigating the death of the "John Doe" and discovered that he had died from a gunshot wound to the back of his head. On May 12, 2010, Mr. Slaughter, who had moved from Delaware to Georgia, and his wife, Donna Slaughter, contacted police and indicated that their roommate, Michael Haegele, was missing and might be the "John Doe." GBI confirmed that the "John Doe" was Mr. Haegele. GBI then searched the home that Mr. Haegele shared with Mr. Slaughter and Donna Slaughter. During the search, GBI discovered three life insurance policies, all issued

---

[3] The following is a brief summary of the facts necessary for purposes of this Opinion. Unless otherwise noted, the Opinion assumes that the witnesses relied upon by the State in making its arguments under Rule 404 of the Delaware Uniform Rules of Evidence will provide admissible testimony at the trial.

online from the same company, HSBC. One of the policies was in the amount of $500,000 and listed Mr. Haegele as the insured and Mr. Slaughter as the beneficiary. Based in part on this information, GBI arrested Mr. Slaughter for the murder of Mr. Haegele on May 13, 2010. On May 17, 2010, Donna Slaughter confessed to killing Mr. Haegele and, with Mr. Slaughter's assistance, dumping Mr. Haegele's body in Macon County.

During the investigation, GBI also discovered a life insurance policy in the amount of $250,000 in Mr. Slaughter's Georgia residence. This policy listed Mr. Masters as the insured and Mr. Slaughter as the beneficiary. This prompted GBI to contact Delaware police to inquire about Mr. Masters' death. Thereafter, Delaware police reopened its murder investigation. On July 16, 2012, a New Castle County grand jury indicted Mr. Slaughter on Murder in the First Degree and Possession of a Firearm During the Commission of a Felony in relation to the death of Mr. Masters.

The State of Georgia separately tried Mr. Slaughter and Donna Slaughter for the murder of Mr. Haegele. After an extensive trial beginning on October 29, 2012, a jury convicted Donna Slaughter of murder. On August 15, 2013, a different jury convicted Mr. Slaughter of murder and related crimes for Mr. Haegele's death. Mr. Slaughter was sentenced to a life sentence plus thirty years.

On October 4, 2013, Delaware lodged a detainer with Georgia officials in order to procure custody of Mr. Slaughter for his trial in Delaware. On October 9, 2014, Mr. Slaughter arrived at the James T. Vaughn Correctional Center in Delaware. On November 18, 2014, the Court held an office conference at which it entered a scheduling order and set a date for trial. The trial is currently scheduled to begin on January 24, 2017.

3

**B.     PROCEDURAL BACKGROUND**

On September 12, 2016, the State filed the Motion wherein it seeks to admit various incidents of other crimes, wrongs, or acts allegedly committed by Mr. Slaughter. On October 5, 2016, Mr. Slaughter filed a response in opposition to the Motion. The Court held an evidentiary hearing on the Motion on November 2 and November 3, 2016. At the close of the hearing, the Court reserved its decision and agreed to accept supplemental briefing from both parties.

The State filed its Brief in Support of its Motion *in Limine* to Admit Evidence of Other Crimes, Wrongs, or Acts under Delaware Rule of Evidence 404(b) (the "State's Brief") on December 12, 2016. Through the Motion and State's Brief, the State seeks to admit ten separate crimes, wrongs, or other acts to prove identity, which the State represents is the overarching issue in this case.[4] On December 21, 2016, Mr. Slaughter filed a Post-Hearing Answering Brief Opposing State's Motion *in Limine* (the "Opposition Brief"). Mr. Slaughter seeks to exclude each of the ten items of proffered evidence as immaterial to the issue of identity and highly prejudicial. In its reply brief (the "Reply Brief"), the State clarified that it is offering the evidence to show identity, but also to show Mr. Slaughter's motive and plan. The Court permitted Mr. Slaughter to file a Sur-reply (the "Sur-reply Brief"), which was filed on January 4, 2017.

### III. LEGAL AUTHORITY

**A.     RULE 404 OF THE DELAWARE UNIFORM RULES OF EVIDENCE**

Rule 404 of the Delaware Uniform Rules of Evidence ("Rule 404") governs the admissibility of character evidence.[5] Rule 404(a) states that "evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith

---

[4] The State initially sought to introduce eleven items of evidence. However, at the November 2, 2016 hearing on the Motion, the State withdrew one of the items of evidence originally listed in the Motion. *See* Tr. of Nov. 2 Hr'g.
[5] *See* D.R.E. 404.

4

on the particular occasion."[6] Rule 404(b) clarifies that evidence of "other crimes, wrongs, or acts" is similarly inadmissible for the purposes of proving the defendant's character or the defendant's propensity to commit the charged offense.[7] However, "other crimes, wrongs or acts" may be admissible for a non-character purpose, such as proving the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[8]

## B.     THE *GETZ & DESHIELDS* TESTS

The Court's reasoning on the Motion is controlled by two Delaware Supreme Court cases: *Getz v. State*[9] and *Deshields v. State*[10]. In *Getz*, the Delaware Supreme Court articulated a six-part test for courts to consider when assessing the admissibility of evidence under Rule 404(b):

> (1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case;
>
> (2) The evidence of other crimes must be introduced for a proper purpose under Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition;
>
> (3) The other crimes must be proven by evidence which is 'plain, clear, and conclusive;'
>
> (4) The other crimes must not be too remote in time from the charged offense; and
>
> (5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.[11]

If a court decides to admit the proffered evidence, *Getz* then enumerates a sixth factor: "(6) The

---

[6] D.R.E. 404(a).
[7] D.R.E. 404(b).
[8] *Id.*
[9] 538 A.2d 726 (1988).
[10] 706 A.2d 502 (1998).
[11] *Getz,* 538 A.2d at 734.

5

jury must be instructed regarding the evidence's limited purpose as required by D.R.E. 105."[12]

In *Deshields*, the Delaware Supreme Court went on to provide additional guidance for courts to consider when balancing the probative value of the proffered evidence with its unfair prejudice under the fifth prong of the *Getz* test:

(1) The extent to which the point to be proved is disputed;

(2) The adequacy of proof of the prior conduct;

(3) The probative force of the evidence;

(4) The proponent's need for the evidence;

(5) The availability of less prejudicial proof;

(6) The inflammatory or prejudicial effect of the evidence;

(7) The similarity of the prior wrong to the charged offense;

(8) The effectiveness of limiting instructions; and

(9) The extent to which prior act evidence would prolong the proceedings.[13]

If evidence of another crime or wrong is offered during the State's case-in-chief, the *Deshields* court also warns of the need for the proffered evidence to possess "independent logical relevance" to the crime charged.[14]

## IV. DISCUSSION

The State seeks to admit the following incidents to prove principally Mr. Slaughter's identity as the individual who murdered Mr. Masters:

1. The May 2010 murder of Mr. Haegele in Georgia;

2. The 2007 renter's insurance fraud on Vandever Avenue, Wilmington, DE apartment committed with assistance of Eric Whitehead;

---

[12] *Id.*
[13] *Deshields*, 706 A.2d at 506–07.
[14] *Id.* at 507.

6

3. The 2007 attempted renter's insurance fraud on Herron Court Bear, DE apartment committed with the assistance of Mr. Whitehead;

4. The 2007 false report of Criminal Mischief/Hate Crime occurring at Herron Court;

5. False information contained in Mr. Slaughter's application for loan and purchase of an Acura SUV in 2006;

6. False information contained in Mr. Slaughter's 2006 rental application at St. Andrews Apartments in New Castle, DE;

7. Testimony from Ed Bailey about a conversation with Mr. Slaughter, which occurred prior to the murder of Mr. Masters, where Mr. Slaughter suggests Mr. Bailey get back together with his ex-girlfriend, take out a life insurance policy on her, then kill her to collect the money;

8. Testimony from Mr. Bailey regarding solicitation by Mr. Slaughter to burn down his Herron Court address in order to collect renter's insurance;

9. Testimony regarding a $100,000 HSBC Life Insurance policy taken out on Joyce Slaughter, listed as the insured, and Mr. Slaughter listed as the beneficiary;

10. Testimony from Mr. Whitehead regarding incident on Market Street Railroad Bridge involving Mr. Masters and Mr. Slaughter in October 2007.[15]

In its Reply Brief, the State alleges that the foregoing evidence also establishes Mr. Slaughter's motive and plan. The Court must now decide whether each prior and subsequent bad act is admissible under Rule 404(b) pursuant to the *Getz* and *Deshields* framework.[16]

A.    THE MAY 2010 MURDER OF MR. HAEGELE IN GEORGIA IS ADMISSIBLE

The State first seeks to admit evidence of the May 2010 murder of Mr. Haegele in Georgia (the "Haegele Murder") to prove Mr. Slaughter's identity. The State alleges that the Haegele Murder is similar enough to the murder of Mr. Masters (the "Masters Murder") to be admissible for purposes of establishing Mr. Slaughter's identity as the individual responsible for

---

[15] *See* State's Br.

[16] While evidence of bad acts under Rule 404(b) generally pertains to acts occurring *prior* to the charged offense, Delaware courts have extended Rule 404(b) to apply to *subsequent* bad acts as well. *See e.g., Getz*, 538 A.2d at n.3. Mr. Slaughter does not challenge admitting the 2010 murder of Michael Haegele in Georgia on the basis that it is a subsequent bad act. Therefore, the Court need not address this issue further.

7

the Masters Murder. Mr. Slaughter seeks to exclude this evidence based on its "overwhelming" prejudice.[17]

In weighing the factors in *Getz*, the Court finds that the Haegele Murder is admissible because it is offered for a proper purpose and is material, reliable, and highly probative. The Haegele Murder satisfies the proper purpose prong of *Getz* because it is offered to show identity based on the Haegele Murder's similarities to the crime charged. The Haegele Murder is also material as Mr. Slaughter claims he did not kill Mr. Masters and thus, identity is directly at issue. This Court has explained, however, that even if identity is at issue, "it does not follow that evidence of any similar crime is admissible to show identity."[18] Instead, for identity to be established, "the pattern and characteristic of the uncharged misconduct and the charged offense must be so unusual and distinctive to be like a signature."[19]

Here, the State purports to be able to factually demonstrate significant similarities between the Haegele Murder and the Masters Murder. In both cases, Mr. Slaughter took out a life insurance policy on Mr. Haegele and Mr. Masters from the same bank. Mr. Slaughter also listed himself as the beneficiary of both policies. All payments on both policies were made by individuals other than Mr. Slaughter but who had a close relationship with Mr. Slaughter. In both cases, the victims were murdered on, or before the day the next premium was due under the insurance policies' terms. Additionally, in both cases, Mr. Slaughter employed an online dating website to find individuals he could exploit to help with the commission of the crimes. Finally, both victims led reckless lifestyles and both victims were shot in the back of the head.[20] The

---

[17] *See* Def.'s Opposition Br. p. 10.
[18] *State v. Rodriguez*, I.D. No. 0904025840, 2010 WL 1987520, at *4 (Del. Super. May 18, 2010).
[19] *Id.*
[20] In its Brief, the State lists other similarities between the two murders, but never established these similarities on the record at the 404(b) hearing. *See* State's Br. p. 7. The Court will not consider these similarities in ruling on the Motion, but notes that the State is not precluded from presenting these similarities at trial. Mr. Slaughter's counsel has expressed concern that the State has not sufficiently established the record and would have the Court limit the

Court finds that these similarities are sufficiently unusual and distinct to admit at trial for the purpose of establishing identity.

In weighing the materiality and proper purpose prongs, the trial court must also ensure that acts of prior misconduct have "independent logical relevance and do not further the purpose of showing a predisposition to commit the crime charged."[21] Here, the State is not presenting evidence of the Haegele Murder solely for the purpose of showing Mr. Slaughter's bad character or his propensity to commit murder. Instead, the State is presenting evidence of how the Haegele Murder is similar in many important respects to the Masters Murder. This has independent relevance, is material, and satisfies a proper purpose under Rule 404(b).

Evidence of the Haegele Murder is also established by "plain, clear, and conclusive" evidence and is not too remote in time to be admissible at trial. The State has easily proven the Haegele Murder by "plain, clear, and conclusive" evidence because Mr. Slaughter and his co-defendant, Donna Slaughter, were both tried and convicted in separate jury trials for the Haegele Murder. The Haegele Murder is also not too remote in time because it occurred three years after the Masters Murder.[22] While there is no bright line test for determining whether an act is too remote, courts tend to analogize the remoteness prong of *Getz* to the ten-year time limit contained in Rule 609(b).[23] The Court is satisfied that the evidence of the Haegele Murder is sufficiently reliable to admit at trial.

The harder issue is whether the probative value of the Haegele Murder is substantially outweighed by unfair prejudice under the fifth prong of *Getz*, the *Deshields* test, and Rule 403.

State to the information presented at the hearing. The Court is unaware of any case law restricting the State's presentation of evidence at trial to what it established at a 404(b) hearing.

[21] *See Allen v. State*, 644 A.2d 982, 984–85 (Del. 1994); *Weber v. State*, 547 A.2d 948, 955 (Del. 1988).

[22] *See Moorhead v. State,* 638 A.2d 52, 55 (Del. 1994) (holding that evidence of two prior convictions which occurred between three and six years prior to the charged incident is not excessively remote); *Kornbluth v. State,* 580 A.2d 556, 558 (Del. 1990) (finding evidence of drugs sales over a four-year period to be close enough in time to satisfy Rule 404(b)).

[23] *See Allen*, 644 A.2d at 988 (comparing the remoteness prong of *Getz* to the timeframe under Rule 609(b));

9

The Court acknowledges that evidence of the Haegele Murder would prejudice Mr. Slaughter and could potentially inflame the jury if not presented properly. This prejudice is due in large part to the fact that the proffered evidence on the Haegele Murder and the charged offense are so similar. However, the question for the Court to determine is whether this prejudice *substantially* outweighs the probative value of the evidence. The Court finds that it does not.

The probative force of the proffered evidence is very strong. Based on the similarities noted above, the Haegele Murder carries substantial probative force in proving the State's theory of the case that Mr. Slaughter murdered Mr. Masters to collect the life insurance. Under *Deshields*, the proponents need for the evidence, the availability of less prejudicial proof, and the extent to which the point to be proved is disputed are all relevant factors for the Court to consider.[24] It is clear that the State seeks to prove identity, which is in dispute since Mr. Slaughter is claiming his innocence. It is also clear that the evidence is needed as there were no eyewitnesses to the Masters Murder (other than Mr. Slaughter) and, by its own admission, the State's case is largely circumstantial. This means the State must present other evidence proving the identity of the individual who murdered Mr. Masters. The State has carefully researched the similarities between the Haegele Murder and the Masters Murder and will rely on those similarities for the purpose of proving Mr. Slaughter's purported identity as the person who killed Mr. Masters. Moreover, there is no less prejudicial proof that the State could offer as it would be near impossible to present the similarities between the Haegele Murder and the Masters Murder without presenting evidence related to the Haegele Murder. All these factors contribute to the probative force of the evidence and weigh in favor of the State.

Moreover, the risk of unfair prejudice is mitigated by the fact that the evidence will not unduly prolong trial and that the Court will provide a limiting instruction to the jury. The murder

---

[24]*Deshields*, 706 A.2d at 506–07.

trial is set to last six weeks. The State has disclosed that it will call three witnesses to discuss the Haegele Murder. The Court is satisfied that these three witnesses would not unduly prolong the trial. The Court is also prepared to give a limiting instruction to the jury, and it looks to *White v. State*[25] for guidance in crafting an appropriate jury instruction.

In *White*, the State charged the defendant with first degree murder for the killing of a woman during the commission of a rape and burglary.[26] Because there were no eyewitnesses to the murder, the identity of the defendant was in dispute.[27] Based on this fact, the State relied on a prior rape and murder committed by the defendant that was substantially similar to the present rape and murder.[28] The trial court permitted the State to present evidence of the prior rape and murder based on the distinctive and unusual similarities to the present murder and its probative value in proving identity.[29]

The defendant appealed the trial court's decision, arguing that the unfair prejudice substantially outweighed the probative value.[30] The Criminal Court of Appeals of Alabama disagreed with the defendant.[31] In finding that the unfair prejudice did not substantially outweigh the probative value, the *White* court looked to the jury instruction provided by the trial court.[32] After providing a lengthy instruction on Rule 404 evidence generally, the trial court instructed the jury that the evidence should only be considered to establish identity.[33] The *White* court noted that the trial court did not "provide a laundry list of every conceivable [Rule 404(b)]

---

[25] 179 So.3d 170, 181 (Ala. Crim. App. 2013).
[26] *White*, 179 So.3d at 181.
[27] *Id.* at 186.
[28] *Id.* at 184.
[29] *Id.*
[30] *Id.* at 186.
[31] *Id.*
[32] *Id.* at 187–88.
[33] *Id.* at 189.

11

use" for which the jury could consider the evidence.[34] Instead, the trial court confined the jury's consideration of the prior crime to the Rule 404(b) purpose that the State offered.[35] The court held that this greatly lessened the prejudicial effect of admitting the prior crime, such that the trial court properly concluded that the unfair prejudice did not substantially outweigh the probative value.[36]

The Court can mitigate the prejudicial effect of the Haegele Murder by similarly instructing the jury that the evidence of the Haegele Murder should only be considered to establish identity and should not be considered to infer anything about Mr. Slaughter's character or his propensity to commit the crime charged. The Court will confine the State's use and the jury's consideration of the evidence to identity purposes only. The Haegele Murder will not be used to establish or consider other Rule 404(b) purposes.[37] After appropriate instruction, the Court is confident that the jury could weigh the evidence of the Haegele Murder for the purpose of determining whether the facts of the present case prove beyond a reasonable doubt that Mr. Slaughter is the individual who murdered Mr. Masters.

**B.** **THE INCIDENTS OF RENTER'S INSURANCE FRAUD ARE INADMISSIBLE**

The State seeks to admit two instances of renter's insurance fraud allegedly committed by Mr. Slaughter. The State provides that evidence of these insurance frauds would come, in significant part, from testimony by Mr. Slaughter's friend, Mr. Whitehead. Mr. Whitehead would purportedly testify that he and Mr. Slaughter "concocted a plan whereby [Mr. Slaughter]

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] The State briefly notes in the Motion that all items of evidence are "being offered to show proof of motive, opportunity, intent, preparation, plan, and identity" and again notes this in its Reply Brief. *See* State's Mot. p. 1; State's Reply Br. ¶ 9. However, the State never articulates at any point in the Motion, the State's Brief, or the Reply Brief how the Haegele Murder is probative in establishing any other proper purpose under Rule 404(b) besides identity. The Court will not instruct the jury to consider every possible Rule 404(b) use related to the Haegele murder as that instruction would be too broad and would unfairly prejudice Mr. Slaughter.

would rent an apartment, but they would not actually live in the residence, obtain renter's insurance, and report a burglary at the residence in order to file a false insurance claim."[38]

The Court will exclude the evidence of renter's insurance fraud because the probative value is substantially outweighed by the danger of unfair prejudice. The Court first notes that the evidence satisfies the fourth prong of *Getz* because the instances of alleged insurance fraud occurred less than a year before the Masters Murder. The evidence also satisfies the "plain, clear, and conclusive" prong of *Getz* because the State plans to call Mr. Whitehead to testify at trial. Delaware courts have repeatedly held that the testimony of a witness is sufficient to satisfy the "plain, clear, and conclusive" standard.[39] Additionally, the State previewed the testimony of Mr. Whitehead at the 404(b) hearing through the testimony of Officers Abram and Vikara, who interviewed Mr. Whitehead about the incidents. Therefore, the Court does not find that the evidence presents issues of unreliability.[40]

The Court does find, however, that the proffered evidence presents issues of materiality and proper purpose. The State discloses at the beginning of its Motion that "the analysis for the first two *Getz* factors will be identical for each of the pieces of evidence the State seeks to admit. Specifically, identity is the overarching issue of material fact in this case."[41] However, the State never articulates how these instances of renter's insurance fraud support its identity argument. This is a murder trial. The State is not trying Mr. Slaughter for insurance fraud, where the issue of identity would be proven in part by past instances of fraud. The Court cannot see, nor does

---

[38] State's Br. p. 9.

[39] *Campbell v. State*, 974 A.2d 156, 162 (Del. 2009); *Lloyd v. State*, 604 A.2d 418 (table) (Del. 1991).

[40] The Court notes, however, that if the State fails to call Mr. Whitehead to testify at trial, this would raise issues of reliability and the Court could exclude presentation of this evidence. In this case, the officers' testimony of the statements made by Mr. Whitehead would not be sufficient to satisfy the "plain, clear, and conclusive" standard in *Getz*. *See Renzi v. State*, 320 A.2d 711, 712 (Del. 1974) (excluding the hearsay testimony of a police officer about a prior crime because it was not established by "plain, clear, and conclusive" evidence, when that officer had no firsthand knowledge of the crime and was simply relaying the statements of a witness who did not testify at trial).

[41] State's Br. p. 3.

13

the State articulate, how renter's insurance fraud is relevant to proving Mr. Slaughter's identity in this murder case.

Later in its Reply Brief, the State argues that the insurance fraud also establishes Mr. Slaughter's plan or motive. In the absence of additional evidence, the Court could see how this evidence would be related to Mr. Slaughter's plan or motive — Mr. Slaughter planned to kill Mr. Masters to collect the insurance proceeds, as he had done with the renter's fraud schemes in the past. However, the State's theory of the case is that Mr. Slaughter killed Mr. Masters to collect the *life insurance* proceeds. The State has available probative evidence establishing this theory through the life insurance policy taken out by Mr. Slaughter on Mr. Masters and, as discussed *infra*, Joyce Slaughter. These life insurance policies are more probative to establishing motive or plan because it relates directly to the murder itself and provides a viable link between the Masters Murder and Mr. Slaughter. Alleged instances of *renter's insurance fraud* do not carry the same probative force in establishing plan or motive in this murder case. Therefore, the Court sees no reason to prolong the trial by presenting less probative evidence when the State already has and will present evidence of Mr. Slaughter's identity, motive, and plan.

The argument that the renter's fraud is immaterial to the State's case, however, cuts both ways. As discussed above, fraud and murder are two distinct crimes. Because of this, there is little, if any, risk that the jury would engage in propensity reasoning. The Court does not foresee the jury reasoning that, because Mr. Slaughter committed renter's insurance fraud, he is guilty of murder. While the evidence may not be used for propensity purpose, the Court is still concerned that it could be used to infer Mr. Slaughter's bad character. Rule 404(b) instructs the Court that evidence of "other crimes, wrongs, or acts" is inadmissible for the purposes of proving the

14

defendant's propensity to commit the crime *or* defendant's character.[42]  If the Court permits the State to present evidence of not one, but two, instances of renter's fraud, the jury could opine that Mr. Slaughter is a person of bad character and should be punished.  Therefore, the Court finds that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice to Mr. Slaughter.

## C.     THE FALSE REPORT OF A HATE CRIME AT HERRON COURT IS INADMISSIBLE

The States next seeks to introduce evidence that Mr. Slaughter allegedly filed a false report of a hate crime committed at his Herron Court apartment.  Specifically, this evidence involves an allegation that Mr. Slaughter staged a crime scene by drawing hate writing in black marker on the door to his residence.

The Court will exclude the evidence of the false report of a hate crime committed at Herron Court because the probative value is substantially outweighed by the danger of unfair prejudice.  The Court concedes that the evidence satisfies the "plain, clear, and conclusive" prong of *Getz* because the State produced officers to testify about the incident at the 404(b) hearing and will have Mr. Whitehead testify to the incident at trial.  The evidence also satisfies prong four of *Getz* because the alleged hate crime occurred less than one year prior to the Masters murder.  The proffered evidence, however, fails the materiality prong of *Getz* because a staged hate crime is largely irrelevant to whether or not Mr. Slaughter committed the Masters Murder.  The Court could see how such writings may be admissible in the Haegele Murder case because hate writings were found on the body of the victim.  Here, there is no evidence whatsoever that the Masters Murder involved any hate writing, that it was a hate crime or that a hate crime was staged in connection with this murder.

Moreover, the Court is not persuaded that the false report goes towards establishing

---

[42] *See* D.R.E. 404(b).

15

identity as the proper purpose as required by *Getz*. The State would have the Court draw a link between the hate crime and the Haegele Murder, and then a link between the hate crime and the Masters Murder based on its relation to the Haegele Murder. This is too attenuated to allow admission at trial for purposes of identity. Moreover, the inflammatory and prejudicial effect of admitting evidence of a hate crime greatly outweighs the little probative value the evidence serves. For these reasons, in addition to the fact that the State chose not to address this piece of evidence in its Reply Brief, the Court will exclude this evidence.

**D.      THE FALSE INFORMATION ON LOAN AND RENTAL APPLICATIONS IS INADMISSIBLE**

The State next seeks to admit evidence of false information provided by Mr. Slaughter on a car loan application and an apartment rental application. The State alleges that on both applications Mr. Slaughter stated that he was employed and made a certain amount of money, when in fact he was unemployed and had no monthly income.

The Court will exclude the evidence of false information provided by Mr. Slaughter on the applications because the probative value is substantially outweighed by the danger of unfair prejudice, *i.e.*, this evidence fails the materiality and proper purpose prongs of *Getz*. Again, the Court finds that this evidence satisfies the "plain, clear, and conclusive" and "remoteness" prongs of *Getz*. The evidence demonstrates that Mr. Slaughter provided false information on the applications less than two years before the Masters Murder, and will be proven at trial through the testimony of various officers. However, the State does not satisfy the proper purpose prong of *Getz* because the State does not provide a proper purpose for admitting this evidence other than to refer the Court back to its initial identity argument presented for the Haegele Murder. The State chose not to expand upon the proper purpose of this evidence, or address the evidence in any way in its Reply Brief. The Court agrees that the State's proper purpose for admitting the

16

Haegele Murder is to prove identity, but that same argument is inapplicable here. Whether or not Mr. Slaughter provided false financial information does not link him in any meaningful way to the Masters Murder. The evidence clearly fails the threshold tests of materiality and proper purpose under *Getz* and consequently, the Court must exclude the evidence at trial.

**E.** **MR. SLAUGHTER'S ALLEGED SUGGESTION TO MR. BAILEY TO TAKE OUT LIFE INSURANCE ON HIS GIRLFRIEND AND KILL HER IS INADMISSIBLE**

Next, the State seeks to introduce evidence regarding a conversation Mr. Slaughter allegedly had with his roommate, Mr. Bailey, prior to the murder of Mr. Masters. The State alleges that Mr. Slaughter suggested to Mr. Bailey that he rekindle his relationship with his girlfriend, take out a life insurance policy on her, and then kill her. The State will call Mr. Bailey as a witness at trial to testify to this conversation.

The Court will exclude this evidence because its probative value is substantially outweighed by the danger of unfair prejudice. First, the Court is concerned about the reliability of Mr. Bailey's testimony, and whether, based on these concerns, the State has established the testimony of Mr. Bailey by "plain, clear, and conclusive" evidence. Mr. Bailey, who has served time in prison for arson, was originally interviewed by police four separate times about the Masters Murder.[43] However, Mr. Bailey did not tell police about this alleged conversation with Mr. Slaughter until 2012 — five years after he was initially interviewed and five years after the Masters Murder.[44] Despite these concerns, the Court finds that the evidence is not too remote and, so long as Mr. Bailey testifies, is established plainly, clearly, and conclusively.[45]

However, the evidence is highly prejudicial. The Court acknowledges that this conversation is material and has probative force in helping the State establish its identity

---

[43] Tr. of Nov. 3 Hr'g p. 3–6.

[44] *Id.*

[45] Just like with the testimony of Mr. Whitehead, if Mr. Bailey does not actually testify at trial, the Court has the right to exclude the evidence. *See supra* note 39.

argument. However, that probative force does not outweigh the danger of unfair prejudice. In addition to assessing the adequacy of proof of the evidence, *Deshields* instructs the Court to consider the proponent's need for the evidence, the similarity of the prior wrong to the charged offense, and the inflammatory effect of the evidence.[46] These three factors weigh heavily against the State.

While the State would certainly like to present this proffered evidence at trial, it is not necessary to establish its case. The Court has already permitted the State to introduce evidence of the Haegele Murder, which carries substantial probative force on the issue of identity. It has also allowed the State to present evidence of the life insurance policies taken out on Mr. Masters, and, as discussed *infra*, Joyce Slaughter, which carry substantial probative force on the issue of motive and plan. Additionally, the alleged conversation is nearly identical to what the State is alleging occurred in this case. The Court is concerned that this evidence may inflame the jury and persuade it to believe that Mr. Slaughter committed the murder based solely on the conversation with Mr. Bailey. The risk of prejudice here is substantial and outweighs the evidence's probative value, and accordingly, the Court must exclude the evidence at trial.

F.     MR. SLAUGHTER'S ALLEGED SOLICITATION OF MR. BAILEY TO COMMIT ARSON IS INADMISSIBLE

The State also seeks to admit evidence of Mr. Slaughter's alleged solicitation of Mr. Bailey to commit arson. The State will have Mr. Bailey testify that Mr. Slaughter asked him to burn down Mr. Slaughter's Herron Court apartment in order to collect the renter's insurance.

The Court will exclude this evidence because the probative value is substantially outweighed by the danger of unfair prejudice. While there is the issue of whether Mr. Bailey's testimony is reliable, the evidence satisfies the "plain, clear, and conclusive" standard in *Getz*

---

[46] *Deshields*, 706 A.2d at 506–07.

18

and is not too remote in time from the Masters Murder. However, the State fails to establish that the proffered evidence is material or relevant to a proper purpose under *Getz*. The State combines its arguments of identity and plan, first stating that Mr. Slaughter's common plan is "to commit multiple fraudulent property crimes in an attempt to secure insurance proceeds" and then stating that the "manner in which [Mr. Slaughter] attempts to commit his crimes goes towards establishing the identity of the Masters Murder."[47]

The Court acknowledges that establishing Mr. Slaughter's identity and plan is integral to the State's case. However and as previously noted, the State already has evidence to establish Mr. Slaughter's plan and identity through the life insurance policies taken out on Mr. Masters, Mr. Haegele, and as discussed *infra*, Joyce Slaughter. This is the plan most relevant to the State's case and most probative to the issue of identity because it is more directly tied to Mr. Master's murder. Instances of renter's fraud or solicitation to commit arson are not. The Court again sees no reason to prolong the trial to present less probative forms of evidence when the State has available evidence to establish Mr. Slaughter's identity, motive, and plan. The risk that the jury will use this evidence for purposes of propensity is lower because of the distinctive nature of the crimes; however, the Court is concerned that the jury could use the evidence relating to solicitation to commit arson and renter's fraud as proof that Mr. Slaughter is a person of bad character. This piece of evidence has an added layer of prejudice because solicitation to commit arson is involved as well as renter's fraud. Therefore, the Court finds that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice to Mr. Slaughter.

## G.     THE LIFE INSURANCE POLICY TAKEN OUT ON JOYCE SLAUGHTER IS ADMISSIBLE

The State next seeks to introduce evidence that Mr. Slaughter took out a $100,000 life

---

[47] State's Reply Br. ¶¶ 27–28.

insurance policy with HSBC on his aunt, Joyce Slaughter. The State alleges that Joyce Slaughter was ill at the time and had no knowledge of the insurance policy.

The Court will admit this evidence because it is material, serves a proper purpose in the State's case, and its high probative value substantially outweighs any danger of unfair prejudice. Evidence of the Joyce Slaughter life insurance policy is material and serves a proper purpose because it goes directly to establishing identity and Mr. Slaughter's plan to kill Mr. Masters to collect the insurance proceeds. This is the State's theory of the case and what is disputed by Mr. Slaughter. To prove its theory, the State relies in part on the Haegele Murder, where Mr. Slaughter took out a life insurance policy on the victim, then murdered him. Here, the Joyce Slaughter life insurance policy, which Mr. Slaughter took out without his aunt's knowledge when she was in failing health, furthers this theory by showing Mr. Slaughter's plan. Moreover, just like with the Haegele murder, the State is not introducing this evidence to infer Mr. Slaughter's bad character. The State is using the evidence to paint a picture of Mr. Slaughter's identity through his plan of repeatedly taking out life insurance policies on vulnerable individuals that were purchased through HSBC. This has independent logical relevance, is material, and serves a proper purpose.

Additionally, the proffered evidence satisfies prong three and four of *Getz*. The evidence is established by "plain, clear, and conclusive" evidence because Detective Abram will testify at trial to the contents of the life insurance policy and his conversations with Joyce Slaughter. The evidence is also not too remote because Detective Abram found the life insurance policy during the Haegele Murder investigation, less than two years after the Masters Murder.

Moreover, the risk of unfair prejudice does not substantially outweigh the high probative value of the evidence. The Court notes that there is some risk of unfair prejudice in admitting

20

this evidence, as the jury may use it for an impermissible character purpose. However, the Court once again finds that the prejudice is mitigated by the fact that the evidence will not unduly prolong trial and that the Court will give a limiting jury instruction. The State's need for the evidence and its great probative force tips the scales in favor of the finding that the probative value outweighs the unfair prejudice.

## H. THE TESTIMONY FROM MR. WHITEHEAD REGARDING THE INCIDENT AT THE MARKET STREET RAILROAD BRIDGE IS INADMISSIBLE

Finally, the State seeks to offer evidence of an incident where Mr. Masters fell off the Market Street Bridge into the Christina River. The State provides that it will have Mr. Whitehead testify that this incident was a failed attempt by Mr. Slaughter to kill Mr. Masters and collect the life insurance policy.

The Court will exclude Mr. Whitehead's testimony related to the incident and the alleged incriminating statements made by Mr. Slaughter because they are not proven by any evidence, let alone "plain, clear, and conclusive evidence" and are highly prejudicial. At the hearing, Detective Spagnolo testified that on October 13, 2007 around 4:53 a.m., Mr. Slaughter called 911 to report that his friend, Mr. Masters, had fallen into the Christina River.[48] Detective Spagnolo then spoke with Mr. Masters, who said that he was on the train tracks, lost his footing, and fell into the river.[49] According to Detective Spagnolo, this was the same story that Mr. Slaughter provided, even though he was interviewed separately from Mr. Masters.[50] Despite eliciting no testimony from Detective Spagnolo to confirm its theory, the State now seeks to have Mr. Whitehead testify that the incident on the Market Street Bridge was an attempt by Mr. Slaughter to bring about the death of Mr. Masters and collect the insurance proceeds.

---

[48] Tr. of Nov. 3 Hr'g p. 14.
[49] *Id.* p. 40.
[50] *Id.* p. 40–44.

The alleged testimony of Mr. Whitehead is in direct contrast to the evidence presented by the State and testified to by Detective Spagnolo. The "plain, clear, and conclusive" evidence is that Mr. Masters accidently fell off the Market Street Bridge. The State's theory that Mr. Slaughter was somehow responsible for Mr. Master's accident is established by nothing more than its own speculation. By presenting no evidence to corroborate its theory, the State has not and cannot prove its theory of what happened on the Market Street Bridge by evidence that is "plain, clear, and conclusive." Moreover, the risk of unfair prejudice with this evidence greatly outweighs its probative value, as the jury could easily opine on the defendant's bad character or his propensity to commit the Masters murder based on his alleged attempts to previously murder Mr. Masters.

## V. CONCLUSION

For all the foregoing reasons, the Court will **GRANT in Part and DENY in Part** the State's Motion.

**IT IS SO ORDERED.**

/s/ *Eric M. Davis*
Eric M. Davis, Judge